# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 168 | **DATE** | 6/17/2003 |
| **CASE TITLE** | | Alexander vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, Alexander's Motion to Remand [22-1] and Motion for Summary Judgment [23-1] and the Commissioner's Motion for Summary Judgment [31-1] are all denied. The case is remanded to the Commissioner of Social Security for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | JUN 18 2003 | | 36 |
| | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | 6/17/2003 | | |
| | | U.S. DISTRICT COURT CLERK | date mailed notice | | |
| cav | courtroom deputy's initials | | cav | | |
| | | 03 JUN 17 PM 2: 54 | mailing deputy initials | | |
| | | Date/time received in central Clerk's Office | | | |

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

JUN 1 8 2003

| | |
|---|---|
| MELVIN ALEXANDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. 01 C 0168 |
| | ) |
| JO ANNE B. BARNHART,[1] Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Melvin Alexander seeks review of the final decision of the Commissioner of

Social Security ("Commissioner") denying his application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §1382. This matter is before the

Court on the parties' cross-motions for summary judgment and Alexander's motion to remand in

light of new evidence. The parties have consented to the jurisdiction of the United States

Magistrate Judge pursuant to 28 U.S.C. §636(c). For the reasons set forth below, all of the

motions are denied and the case is remanded for further proceedings consistent with this opinion.

---

[1]     On November 9, 2001, Jo Anne B. Barnhart became the Commissioner of Social
Security. Ms. Barnhart is automatically substituted for Larry Massanari as the defendant in this
action. Fed. R. Civ. P. 25(d)(1); 42 U.S.C. §405(g).



## PROCEDURAL HISTORY

On December 30, 1991, Alexander was found to be disabled based on drug addiction and/or alcoholism. (R. 17). In 1996, he was notified that his disability benefits would end on January 1, 1997 in accordance with Public Law 104-121. That law, enacted on March 29, 1996, amended the Social Security Act to provide that an individual will not be considered disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination that the individual is disabled." *See* 42 U.S.C. §423(d)(2)(C). Alexander did not file an eligibility redetermination request within the appeal period and did not show good cause for failing to do so.

Alexander thus filed a new application for SSI on December 11, 1996, claiming that he had been disabled since October 1990 due to hypertension and a seizure disorder. (R. 54-55, 57). His application was denied initially and again on reconsideration. (R. 35-46). The Commissioner found that Alexander was not disabled because his hypertension and seizures were controlled with medication and the seizures occurred infrequently. (R. 37). Alexander appealed the Commissioner's decision and requested an administrative hearing, which was originally scheduled for December 4, 1997. On that date, Alexander appeared without counsel and the Administrative Law Judge ("ALJ") advised him of his right to representation. (R. 316-17). The ALJ continued the hearing "for the purpose of obtaining additional medical evidence concerning the claimant's condition." (R. 17, 318-21). The hearing was ultimately held on February 23, 1998 with Alexander's counsel present. (R. 246-313).

On October 19, 1998, the ALJ denied Alexander's claim for SSI. The ALJ found that Alexander was disabled by seizures but could perform a significant number of jobs in the

2

national economy if he stopped using alcohol. Thus, pursuant to Public Law 104-121, Alexander was ineligible for disability benefits. (R. 27, 28). On November 15, 2000, the Appeals Council denied Alexander's request for review (R. 4-5), and the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§416.1481.

## FACTUAL BACKGROUND

Alexander, born on February 13, 1953, was 45 years old at the time of the hearing before the ALJ. (R. 248). He has an eleventh grade education and has not worked since 1989. His past jobs include machine operator, laborer and material handler. (R. 74, 84, 121, 285-89).

### A.    Medical Evidence

Dr. Jerome Anthony has been one of Alexander's treating physicians since May 1987. Progress notes dated May 1987 to October 1997 indicate that Dr. Anthony treated Alexander for cellulitis, anemia, bronchitis, swelling of the left leg, hypertension, seizure disorder, alcoholic gastritis and dermatitis. (R. 146-68). On September 7, 1995, Alexander had a venous Doppler ultrasound examination of his left leg which showed normal results. (R. 158-59). A September 10, 1995 chest x-ray similarly revealed no abnormalities. (R. 156). On September 13, 1995, Alexander had a bone marrow aspiration and biopsy which indicated that he was anemic.

On August 28, 1996, Alexander went to the emergency room at St. Bernard's hospital because he had a seizure episode. The hospital noted that he had been drinking gin and smelled of alcohol. (R. 193-94). Alexander received a Dilantin infusion, which he tolerated well. (R. 197).

On January 6, 1997, the Bureau of Disability Determination Services ("DDS") prepared a telephone report of information supplied by Dr. Anthony's office. That report indicated that

3

Alexander had hypertension and a seizure disorder, averaging "approximately 2 to 3 grand mal seizures per year." The report noted that the seizures were "fairly well controlled" and that Alexander "does have a history of alcohol abuse." DDS sent the report to Dr. Anthony for his signature but the copy in the record is unsigned. (R. 125-26). On January 21, 1997, Dr. Anthony completed a cardiac report for the Bureau of Disability Determination Services. Based on Alexander's most recent examination on September 6, 1996, Dr. Anthony reported that he had hypertension and was taking Procardia XL for that condition. However, Alexander did not suffer from congenital heart disease, arrhythmia, neurological complications or chronic heart failure. (R. 122-23).

On March 13, 1997, Dr. Pratap C. Kumar, also one of Alexander's treating physicians, prepared a report indicating that he had been treating Alexander for several years for alcohol-induced cardiomyopathy (a reduction in the strength of the heart muscle), high blood pressure, and a seizure disorder "secondary to chronic alcohol abuse." (R. 127). The cardiomyopathy caused Alexander to experience shortness of breath precipitated by exercise and walking, and "sometimes chest pain and leg swelling." The chest pain "d[id] not conform to the pattern of coronary artery disease," and he was not being treated for that condition even though he did have one atypical symptom – left-sided pain without radiation. (*Id.*) Dr. Kumar indicated that Alexander had been suffering from a seizure disorder "for many years" and was taking Dilantin, an anti-seizure medication. According to Dr. Kumar, "This continuation[2] of the Dilantin will precipitate seizure disorder in this patient." Dr. Kumar noted that Alexander's last seizure was

---

[2]     It appears that this is a transcribing error and should read "discontinuation."

4

"some years ago" and that he "was drinking in spite of her advise [sic] but recently he states he does not drink at all." Alexander also told Dr. Kumar that he stopped smoking. (*Id.*)

Dr. Kumar observed that Alexander had mild pedal edema but no leg edema. (R. 127). Alexander's EKG and echocardiogram studies showed diminished left ventricular function with an ejection fraction at around 40 percent, which is below normal. (R. 128, 252). A chest x-ray showed cardiomegaly – enlargement of the heart. Stedman's Medical Dictionary (5th Unabridged Lawyer's Ed.) ("Stedman's"), p. 226. Alexander's liver was not enlarged but his liver enzymes were mildly elevated. (*Id.*) Dr. Kumar indicated that Alexander's seizures were "now stable" and that he needed to continue taking Dilantin to avoid further seizures. He also needed "continuous medical care with supervision of cardiologist for his cardiac status" and treatment for anemia. (R. 128).

**B.     Plaintiff's Testimony**

At the hearing before the ALJ, Alexander testified that he experiences pain from an injury he sustained to his right knee while stepping off a bus in 1990, and that swelling in his left knee and ankle causes him pain and prevents him from walking more than four or five blocks. (R. 255-56, 260-61, 264-65). The swelling "comes and goes," usually lasting three or four days. (R. 256). Alexander stated that he takes Ibuprofin for lower back pain and estimated that he can stand for an hour at a time and sit "for hours." (R. 262-63, 268). He also reported shortness of breath with activity and sometimes while at rest. (R. 264). Alexander testified that he takes Dilantin three times a day for seizures but that he nonetheless has seizures four or five times a month, the most recent being the Thursday before the hearing. (R. 265-66, 269). He submitted seizure description forms from his brother and two friends all indicating that he had more than

5

one seizure per month that caused him to lose consciousness and experience memory loss. However, Alexander's brother only witnessed two such seizures from January through April 1997 and one friend only witnessed two seizures from January through March 1997. The other friend saw three seizures in January 1997 but none thereafter through May 9, 1997. (R. 113-15).

Alexander testified that in addition to the Dilantin, he takes various other medications to control his hypertension and to relieve symptoms of asthma or bronchitis. (R. 276-80). He stated that the Dilantin makes him feel tired and occasionally causes him to fall asleep for an hour or two during the day. (R. 293, 308-09). He also stated that he stopped drinking alcohol in the fall of 1994. (R. 295). Alexander testified that he lives alone but receives help from his family in paying the rent. (R. 284).

## C.    Medical Expert Testimony

Dr. David I. Abramson, a specialist in cardiovascular diseases, testified at the hearing as a medical expert ("ME"). (R. 249). Dr. Abramson did not personally examine Alexander, but he reviewed his medical history, listened to Alexander's testimony and had the opportunity to question him directly. (R. 249-70). Dr. Abramson stated that the seizure episodes described by Alexander, his brother and his two friends sounded like grand mal seizures. However, there were no EEG results in the record to enable him to conclude that the seizures met or medically equaled one of the impairments listed in the Social Security Regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §11.02. (R. 271).

The ME stated that Alexander had some enlargement of the heart and reduced function in the left ventricle, but that he did not have congestive heart failure. (R. 271-72). Dr. Abramson noted that Alexander did have some edema of his lower extremities which can indicate

6

congestive heart failure, but felt that it was instead related to low protein in the blood stream. (R. 252). He also stated that Alexander's ejection fraction, though low, was not low enough to demonstrate congestive heart failure. In reaching this conclusion, the ME found it significant that Alexander did not have an enlarged liver, was not taking any of the usual medications for congestive heart failure, did not have any fluid in the abdominal cavity, did not show signs of shortness of breath while sitting quietly and could walk for four or five blocks before becoming short of breath. (R. 252, 282). According to Dr. Abramson, he has seen "a great number of cases of congestive heart failure" and did not believe Alexander was suffering from that condition. (R. 283).

Dr. Abramson testified that Alexander's hypertension was "well controlled" but that he had mildly elevated liver enzymes. (R. 252, 272). He agreed with Dr. Kumar's assessment that Alexander's elevated liver enzymes and cardiomyopathy were due to alcohol but without an EEG, he could not determine whether the seizures were alcohol-induced as well. (R. 297). He felt that due to the seizures, Alexander should not work at heights or around moving machinery. The ME also stated that Alexander should not lift more than 20 pounds, climb, or engage in strenuous pushing or pulling. (R. 273).

## C.    Vocational Expert Testimony

Grace Gianforti testified at the hearing as a vocational expert ("VE") and stated that Alexander's past relevant work all involved medium to heavy exertion. (R. 299, 302). She indicated that an individual of Alexander's age, education and work experience could perform various sedentary jobs available in the Chicago metropolitan area. (R. 304). However, if the

7

person suffered from unpredictable seizures more than once a month, he would not be a good candidate for competitive employment. (R. 305).

E.    **Consultative Evaluation**

After the hearing on March 31, 1998, Claude Hamilton, M.D., performed a neurological consultative examination of Alexander at the request of DDS. (R. 171-80). Prior to the exam on March 19, 1998, Alexander had an EEG which was normal. (R. 171). During the evaluation, Alexander told Dr. Hamilton that he visited his doctor approximately once every two months and that he smoked half a pack of cigarettes per day. (*Id.*) Dr. Hamilton stated that Alexander described seizures which "sound grand mal in nature" occurring two to three times a month, but also noted Dr. Anthony's report that the seizures occurred two to three times per year. (R. 171-72). Alexander told Dr. Hamilton that he never missed taking his seizure medication and that he had been sober for one year. Dr. Hamilton noted, however, that Alexander smelled of alcohol and was "malodorous" and "disheveled." (R. 172, 173).

With respect to physical activity, Alexander told Dr. Hamilton that he could walk approximately one block without stopping and could climb one flight of stairs without problem. He reported no problems sitting and stated that he could stand for approximately 20 minutes at a time. He also said that he could lift up to 20 pounds. (R. 172). Though Alexander testified at the hearing that he lived alone, he told Dr. Hamilton that he lived with his family and that they did most of the chores around the house. (*Id.*)

Dr. Hamilton noted that Alexander's lungs were clear and that his liver did not appear enlarged. There was increased pigmentation in his lower extremities "suggestive of a history of brawny edema" – *i.e.*, "[a]n accumulation of an excessive amount of watery fluid in cells, tissues

8

or serous cavities." Stedman's, p. 443. (R. 173). Alexander could walk 50 feet without the use of a cane but he did have difficulty with his tandem gait "to a moderate degree, suggestive of some cerebellar degeneration related to alcohol abuse." (R. 174). Dr. Hamilton observed that Alexander had a full range of motion and normal grip strength but the doctor was unable to obtain ankle jerk reflex responses. (R. 174-75).

Based on his examination, Dr. Hamilton found that Alexander had a history of alcohol abuse, and noted that he "definitely smelled of alcohol" despite the fact that he denied drinking at that time. Dr. Hamilton also found chronic seizure disorder, most likely related to alcohol abuse. "That is, alcohol withdrawal seizures." (R. 175). He indicated that Alexander's prognosis was "guarded" and suspected that he "will continue to have seizures, especially if he continues to drink." (*Id.*) Dr. Hamilton stated that Alexander's hypertension appeared "stable and controlled at this time." (*Id.*) In an April 3, 1998 Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Hamilton opined that Alexander could lift up to 20 pounds frequently and 30 pounds occasionally, could stand or walk for four to eight hours per day, one to two hours at a time, and could sit without limitation. (R. 179). The doctor also indicated that Alexander could not work at heights or around moving machinery and had some limitations as to pushing and pulling. (*Id.*) Dr. Hamilton qualified his analysis to note that Alexander would be limited in many other aspects of work activity if he had a seizure. (R. 179-80).

**F.     The ALJ's Findings**

The ALJ found that Alexander suffered from several severe impairments, including cardiomyopathy, hypertension, chronic seizure disorder most likely related to alcohol abuse, and alcohol abuse. (R. 20). He did not find that Alexander's complaints of ankle and feet problems

9

and back pain were severe impairments because they were not supported by objective medical evidence. The ALJ noted the ME's testimony that Alexander's seizure disorder would meet one of the impairments listed in the regulations if supported by an EEG, but the March 19, 1998[3] EEG was normal and showed no epileptiform activity. Thus, the ALJ considered Alexander's residual functional capacity to perform work. (R. 21). In making this assessment, the ALJ discussed in detail the progress notes and cardiac report from Dr. Anthony, the March 4, 1997 report from Dr. Kumar, and the March 31, 1998 report from Dr. Hamilton. He also reviewed records from Alexander's August 28, 1996 emergency room treatment following a seizure. (R. 21-24).

The ALJ found that Alexander had the following abilities: lifting, carrying, pushing and pulling up to 20 pounds frequently and 30 pounds occasionally; sitting a total of six out of eight hours per day for no more than two hours at a time; and standing for two to three hours in an eight-hour period for one or two hours at a time. Alexander could not work at heights or around moving or hazardous machinery, and he could not drive or complete a normal workday or workweek due to disruptions from seizures. (R. 21). As a result, he could not perform his past relevant work as a machine operator. (R. 24). The burden then shifted to the Commissioner to show that Alexander could perform other work available in significant numbers in the national economy. (*Id.*) On this point, the ALJ credited the VE's testimony that Alexander's seizures "would preclude competitive employment because of failure to control and lack of warning." (*Id.*) Thus, the ALJ concluded that Alexander was disabled within the meaning of the Act.

---

[3]     The ALJ mistakenly indicated that the EEG occurred on February 19, 1998.

10

In accordance with Public Law 104-121, the ALJ went on to assess whether alcohol and/or drug addiction was a contributing factor material to the determination that Alexander was disabled. That is, the ALJ considered whether Alexander would still be disabled if he stopped using alcohol and/or drugs. (R. 24). The ALJ did not credit Alexander's testimony that he stopped drinking in 1994 given that he smelled of alcohol at his March 31, 1998 consultative examination and at the ER in August 1996. (R. 24-25). Alexander's counsel asked the ALJ to disregard the consultative examination, arguing that the impressions regarding alcoholism were not supported by the record. The ALJ rejected this argument and found that the report was consistent with the treating physician's report of March 4, 1997 which showed that Alexander was suffering from "alcohol induced cardiomyopathy and a seizure disorder secondary to chronic alcohol abuse." (R. 25). The ALJ also noted that the ME opined that Alexander's cardiomyopathy and seizure disorder were "alcohol induced." (*Id.*)

The ALJ again turned to the VE's testimony that Alexander could perform a broad range of sedentary work if he could control his seizures. The ALJ noted that Alexander was taking Dilantin for the seizures but that, according to the ME, Alexander's drinking would nullify the effects of the medication. (R. 25). Based on all of this evidence, the ALJ determined that Alexander would not be disabled if he stopped using alcohol and, thus, was not eligible for benefits under the Act. (R. 26-27).

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is governed by §205(g) of the Social Security Act. *See* 42 U.S.C. §405(g). The ALJ's findings are generally entitled to great

deference because the ALJ, not the court, is responsible for weighing conflicting evidence and for making a final determination of whether the claimant is disabled. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (court may not "reweigh the evidence, or substitute [its] own judgment for that of the Commissioner"). The Court may reverse the ALJ's decision "only if the evidence 'compels' reversal, not merely because the evidence supports a contrary decision." *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 880 (N.D. Ill. 1998) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

At the same time, the court cannot act as an uncritical "rubber stamp" for the Commissioner's decision and should only affirm findings of fact when they are supported by substantial evidence. *Howell v. Sullivan*, 950 F.2d 343, 347 (7th Cir. 1991); *Hereford v. Shalala*, 48 F.3d 1221 (7th Cir. 1995). Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In social security disability hearings, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). Failure to fulfill this duty constitutes good cause to remand for gathering of additional evidence. *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981).

**B.      Five-Step Inquiry**

A person is disabled within the meaning of the Social Security Act if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §416.905. In

determining whether Alexander suffered from a disability, the ALJ conducted the standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§404.1520, 416.920; *Clifford*, 227 F.3d at 868.

A claimant will automatically be found disabled if he makes the requisite showing at steps one through three. *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n.3 (7th Cir. 1999); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). If the claimant is unable to satisfy step three, he must then show that he is unable to perform his prior job. *Henderson*, 179 F.3d at 512 n.3. If he makes this showing, the burden then shifts to the Commissioner to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

## C.    Analysis

Alexander makes five arguments on appeal: (1) the Appeals Council erred in denying review; (2) the case should be remanded to the ALJ for consideration of new and material evidence pursuant to 42 U.S.C. §405(g); (3) the ALJ failed to develop a full and fair record; (4) the ALJ erred in finding that Alexander was not disabled due to alcoholism; and (5) the ALJ erred in finding that Alexander's ankle and feet problems were not severe impairments. The Court addresses each in turn.

## 1.    The Appeals Council's Denial of Review

In appealing the ALJ's decision, Alexander submitted new evidence to the Appeals

Council that was not before the ALJ. (R. 235-43). The evidence included cardiopulmonary and

EEG reports dated May 28, 1997, a liver/spleen scan performed on October 14, 1997, and an

upper GI and chest x-ray performed on November 11, 1998. (R. 239-43). Alexander claims that

the 1997 records[4] constitute new and material evidence under 20 C.F.R. §416.1470(b), and that

the Appeals Council erred in finding them immaterial and denying review. Pl. Mem., pp. 8-10;

Reply Mem., p. 5. The Court disagrees with Alexander's characterization of the Appeals

Council's decision and finds no legal error permitting judicial review of that decision.

The Social Security Regulations provide that:

> if new and material evidence is submitted, the Appeals Council shall consider the
> additional evidence only where it relates to the period on or before the date of the
> administrative law judge hearing decision. . . [The Appeals Council] will then
> review the case if it finds that the administrative law judge's action, findings, or
> conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. §§414.970(b), 416.1470(b). The Court reviews de novo whether the Appeals Council

was correct in finding that the evidence is new, material, and related to the period on or before

the date of the ALJ's decision. *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997);

*Burling v. Barnhart*, No. 01 C 3189, 2002 WL 731129, at *9 (N.D. Ill. Apr. 24, 2002). Absent

some legal error in the Appeals Council's analysis, the decision to deny review is discretionary

---

[4]    Alexander concedes that the November 1998 upper GI and chest x-ray is not
material under 20 C.F.R. §416.1470(b) because it does not "relate to the period on or before the
date of the [ALJ] hearing decision. Pl. Mem., p. 8. *See Marshall ex rel. Phillips v. Barnhart*,
No. 01 C 6962, 2003 WL 1720060, at *12 (N.D. Ill. Mar. 31, 2003).

and unreviewable. *Perkins*, 107 F.3d at 1294; *Yousif v. Chater*, 901 F. Supp. 1377, 1382 (N.D. Ill. 1995).

In its letter denying review, the Appeals Council acknowledged that "where new and material evidence is submitted with the request for review, the entire record will be evaluated and review will be granted where the Appeals Council finds that the [ALJ's] actions, findings, or conclusion is contrary to the weight of the evidence." (R. 4). The Appeals Council then stated that it "considered the contentions raised in [Alexander's counsel's] letter, dated September 25, 2000, as well as the additional [medical] evidence . . . but concluded that neither the contentions nor the additional evidence provides a basis for changing the [ALJ's] decision." (R. 4). These statements implicitly show that the Appeals Council found Alexander's additional evidence to be both new and material; otherwise, it would have refused to consider it at all in denying the request for review. *Perkins*, 107 F.3d at 1294; *Burling*, 2002 WL 731129, at \*9 ("[i]f the Appeals Council were to find additional evidence to be immaterial, then it would refuse to even consider the evidence in the first place").

Alexander's argument that the Appeals Council failed to adequately articulate its reasons for denying review is similarly misplaced. Pl. Reply, pp. 5-6. The Seventh Circuit has held that "the Appeals Council may deny review of an administrative law judge's decision without articulating its reasons." *Damato v. Sullivan*, 945 F.2d 982, 988 (7th Cir. 1991). The Appeals Council did not commit any error of law in denying Alexander's request for review and the decision is not reviewable by this Court. *Perkins*, 107 F.3d at 1294.

**2. Motion to Remand**

As an alternative, Alexander argues that the case should be remanded to the ALJ for consideration of the new evidence pursuant to sentence six of 42 U.S.C. §405(g). Under this section, a court may remand a case to the ALJ to consider new and material evidence if the claimant had good cause for failing to submit it to the ALJ during the prior proceeding. *Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991); *Menolascina v. Barnhart*, No. 01 C 4935, 2002 WL 731147, at *10 (N.D. Ill. Apr. 24, 2002). Evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). New evidence is material if there is a "reasonable probability" that it would change the outcome of the final decision. *Perkins*, 107 F.3d at 1296. To establish good cause, a claimant must at a minimum give some explanation as to why the evidence was not gathered at the proper time. *Burling*, 2002 WL 731129, at *10.

Alexander argues that the 1997 cardiopulmonary and EEG reports and liver/spleen scan are "new" because they were not before the ALJ and are not cumulative of other evidence. Pl. Reply, p. 6. But this is not the test for newness under §405(g). It is clear that both reports were in existence at the time of the administrative proceeding and are not new in that regard. And Alexander does not present any evidence that the reports were unavailable prior to September 25, 2000 when he finally submitted them to the Appeals Council. (R. 235-43). Alexander argues that he had good cause for failing to submit the records during the administrative proceeding but the Court need not address this issue given Alexander's failure to show that the records are "new." *See Cromer v. Apfel*, 234 F.3d 1272 (7th Cir. 2000) ("a remand based on supplementary evidence is appropriate only when the evidence is new, material, and there is good cause for the

16

failure to produce the evidence before the ALJ"); *Sample*, 999 F.2d at 1144 ("[t]o prevail on this issue [of remand under §405(g)], then, the plaintiff must meet the requirements of newness, materiality, and good cause). Thus, remand is not appropriate based on the 1997 cardiopulmonary and liver/spleen reports.

This leaves the November 1998 upper GI and chest x-ray. Alexander had good cause for failing to submit this "new" evidence during the administrative proceeding because it was not in existence at that time. *Sample*, 999 F.2d at 1144. To justify remand, however, Alexander must demonstrate that the document is material; that is, there is a reasonable probability that it would have changed the outcome of the case. *Id.* Alexander does not explain why the specific upper GI and chest x-ray report – which shows a moderate size hiatal hernia, stomach ulcers, possible gastritis and platelike atelectasis[5] involving the lower lungs – reasonably may have changed the ALJ's decision. (R. 239). Relying predominantly on the 1997 cardiopulmonary reports not considered here, Alexander argues only generally that his "pulmonary conditions" would affect his overall exertional abilities and are "particularly relevant, as the ALJ regarded [him] as capable of walking for up to one hour at a time." Pl. Reply, p. 10.

The ALJ stated that Alexander had the following abilities: lifting, carrying, pushing and pulling up to 20 pounds frequently and 30 pounds occasionally; sitting a total of six out of eight hours per day for no more than two hours at a time; walking no more than one hour at a time and no more than one hour total in an eight-hour period; and standing for two to three hours in an eight-hour period for one or two hours at a time. (R. 21, 26). The chest x-ray shows some fluid

---

[5]     "Atelectasis" is defined as "[a]bsence of gas from a part or the whole of the lungs, due to failure of expansion or resorption of gas." Stedman's, p. 135.

17

in Alexander's lower lungs but there is no indication that the condition was permanent or that it would affect his ability to walk or perform any of the other sedentary tasks identified by the ALJ. Thus, it does not create a reasonable probability that the ALJ would have found Alexander unable to perform a broad range of sedentary work due to a pulmonary problem. The November 1998 chest x-ray is not material for purposes of §405(g) and Alexander's motion for remand on this basis is denied. *See, e.g., Brock v. Apfel*, No. 97 C 8694, 1998 WL 808860, at *5 (N.D. Ill. Nov. 16, 1998) (claimant not entitled to remand under §405(g) where additional evidence of pulmonary condition did not create reasonable probability that ALJ would have found her incapable of performing sedentary to light work).

### 3. The ALJ's Development of the Record

In a third attempt at remand for consideration of the new medical records, Alexander argues that the ALJ failed to develop a full and fair record. Pl. Mem., p. 10. An ALJ is required to develop a full and fair record, and "[f]ailure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citing *Thompson*, 933 F.2d at 586). Where, as here, the claimant is represented by counsel, the court will generally respect an ALJ's "reasoned judgment" as to "how much evidence to gather." *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).

Alexander notes that the most recent records from treating physician Dr. Kumar were dated March 1997, nearly a year prior to the February 1998 hearing. Thus, they did not include the May 1997 cardiopulmonary and EEG reports or the October 1997 liver/spleen scan. In addition, Alexander testified to having more frequent seizures than those noted by his physicians in March 1997 (R. 126-27), and he was placed on an additional anti-seizure medication,

18

Neurontin, in early 1998. (R. 172). He also testified about his liver/spleen scan which, he suggests, gave the ALJ notice of a need to obtain records of that test. (R. 259-60). According to Alexander, "[t]he absence of updated treatment records prevented inquiry into issues such as the reasons for the increased frequency of Mr. Alexander's reported seizures, any additional cardiac findings, and the reasons for the change in medication, so as to add Neurontin." Pl. Mem., p. 11.

Alexander is correct that Dr. Kumar's records only went through March 1997, but the ALJ had records from another treating physician, Dr. Anthony, through October 14, 1997. None of the additional medical records identified by Alexander relates to his seizures, and on that issue the ALJ ordered him to undergo a neurological evaluation and an EEG after the hearing. As for Alexander's pulmonary condition, neither he nor his attorney made any reference to a cardiopulmonary examination or any significant breathing condition such that the ALJ should have known to obtain further information. Alexander testified that he experienced some shortness of breath but he also stated that he could walk four or five blocks. (R. 255-56). During the consultative examination, he told Dr. Hamilton that he could walk approximately one block without stopping, climb one flight of stairs without problem, and stand for approximately 20 minutes at a time. He also said that he could lift up to 20 pounds. (R. 172). Taken together, this evidence did not give the ALJ any basis to inquire further into Alexander's pulmonary condition.

With respect to the liver/spleen scan, Alexander claims that it is "suggestive of further heart problems" because it showed an enlarged liver. Pl. Reply, p. 11. The evidence before the ALJ indicated that Alexander had a low ejection fraction but no congenital heart disease or chronic heart failure. The ME testified that he had seen "a great number of cases of congestive heart failure" and did not believe Alexander suffered from that condition. (R. 283).

19

Significantly, the ME's conclusion was based on the fact that Alexander was not taking any of the usual medications for congestive heart failure, did not have any fluid in the abdominal cavity, did not show signs of shortness of breath while sitting quietly and could walk for four or five blocks before becoming short of breath (R. 252, 255-56, 282-83), not just the lack of an enlarged liver as suggested by Alexander.

The ALJ questioned Alexander extensively about his medical conditions and physical capabilities, obtained records from his treating physicians covering the ten-year period between May 1987 and October 1997, ordered a supplemental neurological evaluation and EEG, heard the testimony of a vocational expert, and addressed all conditions identified by Alexander, his treating physicians, a medical expert and a consulting examiner. It was Alexander's burden "to bring to the ALJ's attention everything that shows that he is disabled," including "medical and other evidence that the ALJ can use to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis." *Luna*, 22 F.3d at 693. Though it is not clear why the cardiopulmonary and liver/spleen reports were not before the ALJ, "the ALJ's failure to obtain the evidence is not a reversible error." *Id.*

### 4. The ALJ's Finding Regarding Alcoholism

Alexander next argues that the ALJ erred in finding that Alexander "was not disabled based on any medical conditions other than seizures and that Mr. Alexander would not have seizures if he stopped drinking." Pl. Mem., pp. 12-13. According to Alexander, the ALJ improperly focused on alcohol as the "root cause" of his ailments when "the issue is whether the claimant's ailments would remain, even if the claimant stopped using alcohol." *Id.* at 13.

Alexander also claims that the ALJ failed to consider his cardiac problems and evidence of cerebellar degeneration. *Id.* at 13-14.

The ALJ found that Alexander had several severe impairments, including cardiomyopathy, hypertension, chronic seizure disorder most likely related to alcohol abuse and alcohol abuse. (R. 20). None of the impairments met or equaled one of the impairments listed in the Social Security Regulations, so the ALJ assessed Alexander's residual functional capacity. After an extensive review of Alexander's medical records and the testimony at the hearing, the ALJ found that while Alexander could perform less than sedentary work, he was nonetheless disabled under the Act because his seizures "would preclude competitive employment because of failure to control and lack of warning." (R. 21, 24). However, the ALJ ultimately determined that Alexander was not disabled because he would be able to perform sedentary work if he stopped drinking. (R. 26-27).

As a preliminary matter, the ALJ's conclusion that Alexander continues to drink alcohol despite repeated claims to the contrary is supported by substantial evidence. Alexander stated that he stopped drinking in 1994 but (1) he smelled of alcohol and was disheveled, malodorous and irritable at the March 31, 1998 consultative examination; (2) in March 1997, some three years after Alexander says he stopped drinking, he was seen by his treating physician for alcohol-induced cardiomyopathy; and (3) in August 1996 he smelled of alcohol when he was admitted to the ER. (R. 25).

In any event, the Court agrees that the medical reports are somewhat ambiguous as to whether Alexander's seizures would continue in the absence of alcohol. Dr. Hamilton stated that Alexander had chronic seizure disorder, "most likely related to alcohol abuse. That is, alcohol

withdrawal seizures." (R. 175). Dr. Kumar similarly indicated that Alexander had a seizure disorder "secondary to alcohol abuse" but did not clarify whether the seizures would continue if the drinking stopped. (R. 127). Dr. Anthony reported that Alexander had a seizure disorder and a "history of alcohol abuse" but gave no indication how the two were linked, if at all. Dr. Abramson testified that Alexander's treating physician diagnosed alcoholic seizures. However, he also noted that Alexander testified to having what sounded like grand mal seizures, and stated that he could not determine whether the seizures were related to alcohol withdrawal absent an EEG. (R. 297). The EEG, performed in conjunction with Dr. Hamilton's examination, came back normal. But even Dr. Hamilton stated that Alexander "will continue to have seizures, especially if he continues to drink," which implies that the seizures may not be tied solely to alcohol use. (R. 175). And Alexander has been prescribed at least two anti-seizure medications.

The ALJ gave "full weight" to Dr. Hamilton's report but did not address the doctor's conclusion that the seizures "will continue." Nor did he consider why Alexander would be prescribed two anti-seizure medications if his seizures were solely due to alcohol withdrawal. The ALJ did point out that Alexander's drinking nullified the effects of his seizure medication, Dilantin, and he cited the VE's testimony that Alexander was precluded from competitive employment because of "failure to control the seiz[u]res and lack of warning," not because of any seizure disorder in and of itself. (R. 25, 305). However, no doctor actually stated that Alexander's seizures would be predictable and controlled by medication if he stopped drinking. In fact, Alexander was prescribed a second anti-seizure medication, Neurontin, in early 1998. (R. 172). It is not clear whether the ALJ determined that Alexander's seizures would end entirely or merely be controllable with medication and predictable if he stopped drinking. And the

22

medical evidence on both questions has not been properly developed. The ALJ did not build a logical bridge between the medical evidence and his conclusion that Alexander would not be disabled by seizures if he stopped drinking, and the case must be remanded on this issue. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7ᵗʰ Cir. 1996) (ALJ must "build an accurate and logical bridge between the evidence and the result"); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7ᵗʰ Cir. 2001) (ALJ "need not provide a complete written evaluation of every piece of evidence" but must "articulate, at some minimal level, his analysis of the evidence so that we can follow his reasoning").

As for Alexander's other impairments, however, the record evidence adequately supports the ALJ's finding that they did not preclude sedentary work. As noted, the ALJ found that Alexander's cardiomyopathy was a severe impairment and specifically considered the condition in determining Alexander's residual functional capacity. (R. 20). In making his assessment, the ALJ considered and discussed in detail the records from Alexander's treating physicians. He also considered the report from Dr. Hamilton and the testimony of Dr. Abramson, both of whom indicated that Alexander could perform the sedentary work identified by the ALJ. (R. 21-24, 179-80, 273). Contrary to Alexander's suggestion, the ALJ in no way indicated that the cardiomyopathy was not disabling because it was caused by alcohol abuse, or that it would be reversed if Alexander stopped drinking.

Alexander again argues that the ALJ failed to consider evidence of his heart and pulmonary problems. But as explained earlier, the record before the ALJ did not suggest any congestive heart failure or significant pulmonary conditions. And there is no evidence that the mild to moderate cerebellar degeneration, which the ALJ specifically mentioned (R. 23), and

23

which affected Alexander's gait, would prevent him from performing sedentary work as outlined by the ALJ. Indeed, Dr. Hamilton is the one who diagnosed the condition (R. 174), but he still found that Alexander could stand and/or walk from one to two hours at a time and from four to eight hours in an eight-hour workday. (R. 23, 179-80).

In sum, the ALJ's conclusion that Alexander would not be disabled and would be capable of performing sedentary work if he stopped using alcohol is not supported by substantial evidence in the record solely with respect to Alexander's seizure disorder. *See Richardson*, 402 U.S. at 401 (substantial evidence requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). The case is remanded for further development of the record on that issue.

### 5.    Alexander's Feet and Ankle Problems

Alexander's final argument is that the ALJ erred in determining that his ankle and feet problems are not severe impairments. Pl. Mem., pp. 14-15. The ALJ found no objective evidence to support Alexander's subjective complaints regarding his ankle and feet, but he did consider the symptoms of pain and swelling in assessing Alexander's ability to work. The ALJ noted that Dr. Anthony treated Alexander for swelling of the left leg and that he had a venous Doppler in September 1995. (R. 21). The ALJ also stated that Dr. Kumar found infrequent leg swelling due to the cardiomyopathy and mild pedal edema. (R. 22).

Alexander claims that the ankle and feet condition "could reasonably interfere with a person's ability to walk or stand for prolonged periods." Pl. Mem., p. 15. But Alexander himself testified that he could walk four or five blocks, stand for an hour and sit "for hours." (R. 255-56, 260-61, 268). And he told Dr. Hamilton that he could walk approximately one block without

24

stopping and climb one flight of stairs without problem. He also reported that he could stand for approximately 20 minutes at a time. (R. 172). Based on his examination of Alexander, Dr. Hamilton concluded that Alexander could stand or walk for four to eight hours per day, one to two hours at a time, and sit without limitation. (R. 179). The ALJ, in turn, relied on Dr. Hamilton's conclusion in determining Alexander's residual functional capacity. (R. 23-24, 26). The ALJ's finding regarding Alexander's leg and ankle problem is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Alexander's Motion to Remand (Docket Entry #22-1) and Motion for Summary Judgment (Docket Entry #23-1) and the Commissioner's Motion for Summary Judgment (Docket Entry #31-1) are all denied. The ALJ failed to adequately explain his analysis and develop the record on the question whether Alexander would continue to have seizures if he stopped using alcohol and, if so, whether the seizures would be controllable with medication in the absence of alcohol. Thus, the case is remanded for further proceedings consistent with this opinion.

Nan R. Nolan
NAN R. NOLAN
United States Magistrate Judge

Dated: June 17, 2003